UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

FRAZEE, INC.,

        Plaintiff,

v.                                                    Case No: 6:12-cv-1194-Orl-28GJK

REEDY CREEK HOSPITALITY, LLC, et
al.,

        Defendants.

---

## ORDER

This case is before the Court on the motions for summary judgment (Docs. 147,

148, and 155) filed by the Federal Deposit Insurance Corporation ("the FDIC"), CRE/ADC

Venture 2012-1, LLC ("CRE/ADC"), and Plaintiff, Frazee, Inc. ("Frazee"), respectively.[1]

Having considered the parties' submissions, the Court concludes that the FDIC's motion

must be granted, that CRE/ADC's motion must be granted, and that Frazee's motion must

be denied in part. Ruling is reserved as to other parts of Frazee's motion.

## I.    Background

This action arises from the purchase and renovation of a hotel in Osceola County,

Florida. Defendant Reedy Creek Hospitality, LLC ("RCH") is a limited liability company

whose principals are five brothers—Nasiruddin, Mohammed, Altaf, Nizar, and Nizar (Nick)

---

[1] The pertinent filings are: (1) the FDIC's Motion for Final Summary Judgment (Doc. 147), Frazee's Memorandum in Opposition (Doc. 164), and the FDIC's Reply (Doc. 170); (2) CRE/ADC's Motion for Partial Final Summary Judgment (Doc. 148), Frazee's Memorandum in Opposition (Doc. 165), and CRE/ADC's Reply (Doc. 171); and (3) Frazee's Motion for Final Summary Judgment (Doc. 155), the FDIC and CRE/ADC's Joint Response in Opposition (Doc. 172), and Frazee's Reply (Doc. 176).

Hemani. In 2006, RCH purchased the hotel property with financing provided by Defendant Premier Bank. RCH executed a $5.625 million promissory note, and a mortgage ("the 2006 mortgage") securing that loan was recorded on September 8, 2006, in the public records of Osceola County.[2] In March 2007, RCH and Defendant Florida Builders, Inc., hired Frazee, a general contractor, to renovate the hotel by converting the ten buildings on the property from hotel rooms to condominiums.

Frazee recorded a Notice of Commencement on April 19, 2007. (Doc. 156-1). Later in 2007, Frazee began having difficulty getting paid by RCH and Florida Builders for its work on the project, and on December 28, 2007, Frazee recorded a Contractor's Claim of Lien ("the 2007 lien") against the property in the amount of $5.7 million. (See Claim of Lien, Doc. 156-2).

In late 2007 and 2008, RCH, Premier Bank, and Frazee discussed whether Premier Bank would provide further funding for the project. These discussions included the possibility of a formal construction loan. Ultimately, however, the funding that Premier Bank provided was in the form of loans to individual Hemani brothers or entities controlled by them for the purchase from RCH of completed condominium units on the property. Specifically, Premier Bank funded six loans for the purchases of six blocks of ten completed condominium units each. Six mortgages ("the 2008 mortgages") corresponding to these loans and closings were recorded in the Osceola County public records between March and September 2008.[3] It is undisputed that some of the money from the 2008 closings

---

[2] The mortgage was recorded in Book 3271, Page 580 of the Osceola County public records.

[3] The transactions were as follows: (1) a $1.752 million loan to Altaf Hemani and his wife, Nasreen, on February 28, 2008, for the purchase of ten units in Building H, with

was used to make payments to Frazee and some of it was applied toward the balance of the 2006 loan, though the 2006 loan was not completely paid off.

On November 14, 2008, Frazee submitted a Contractor's Final Payment Affidavit to RCH in the amount of $2,874,257.34. (Doc. 156-3). On December 24, 2008, Frazee filed this lawsuit in state court, seeking, among other relief, foreclosure of its 2007 Claim of Lien. On October 14, 2010, Premier Bank sent written notice to RCH declaring the 2006 loan in default, and on December 13, 2010, Premier Bank filed its Answer and Counterclaim and Cross-claims (hereinafter "Counterclaim") in this lawsuit, (Doc. 5), seeking to foreclose the 2006 mortgage and the six 2008 mortgages.

On March 23, 2012, the Illinois Department of Financial and Professional Regulation, Division of Banking, declared Premier Bank failed, and the FDIC was appointed as receiver for Premier Bank. The FDIC was substituted in this lawsuit for Premier Bank in June 2012, and the FDIC removed the case to this Court on August 2, 2012. (Notice of Removal, Doc. 1). In December 2012, the Premier Bank assets at issue in this case were conveyed by the FDIC to CRE/ADC, and in December 2013, CRE/ADC

---

the corresponding mortgage and warranty deed recorded on March 17, 2008; (2) a $1.752 million loan to a Hemani brother-in-law, Ahmed Lakhani, and his wife, Shamida, on March 4, 2008, for the purchase of ten units in Building H, with the corresponding mortgage and warranty deed recorded on April 2, 2008; (3) a $2.008 million loan to Mohammed Hemani and his wife, Lisa, on May 19, 2008, for the purchase of ten units in Building G, with the corresponding mortgage and warranty deed recorded on June 2, 2008; (4) a $2.008 million loan to Nasiruddin Hemani and his wife, Rozina, on May 20, 2008, for the purchase of ten units in Building G, with the corresponding mortgage and warranty deed recorded on June 2, 2008; (5) a $1.752 million loan to RN Reedy Creek Investments, LLC ("RN Reedy Creek")—of which Nizar Hemani was a member—on August 22, 2008, for the purchase of ten units in Building J, with the corresponding mortgage and warranty deed recorded on September 8, 2008; and (6) a $1.752 million loan to NNH Reedy Creek Investments, LLC ("NNH Reedy Creek")—of which Nizar (Nick) Hemani was a member—on August 22, 2008, for the purchase of ten units in Building J, with the corresponding mortgage and warranty deed recorded on September 8, 2008. (See Docs. 147-16 through 147-29).

was substituted as the proper party to pursue the claims asserted by Premier Bank in the Counterclaim, (see Order, Doc. 146). The FDIC, as the receiver for Premier Bank, remains a Defendant as to the claims brought against Premier Bank by Frazee.

Frazee's Second Amended Complaint ("SAC") (Doc. 12) contains ten counts. In Count I, Frazee seeks to foreclose its 2007 Claim of Lien, naming as Defendants Premier Bank, RCH, Florida Builders, and numerous others.[4]  Frazee also brings claims of Breach of Contract (Count II) and Quantum Meruit (Count III) against RCH and Florida Builders. The other seven counts are brought against Premier Bank (now the FDIC):  Equitable Lien Before Completion (Count IV), Equitable Estoppel (Count V), Equitable Lien After Completion (Count VI), Unjust Enrichment (Count VII), Quantum Meruit (Count VIII), Liability Under Section 713.3471, Florida Statutes (Count IX), and Breach of Contract (Count X).

In its Counterclaim (Doc. 5) Premier (now CRE/ADC) alleges fifteen counts. In Count I, Premier seeks foreclosure of the 2006 mortgage. In other counts, Premier seeks to recover from RCH on the 2006 promissory note (Count II); to recover from several guarantors[5] on Commercial Guaranty Agreements related to the 2006 Promissory Note (Count III); foreclosure of the 2008 mortgages (Counts IV, VI, VIII, X, XII, and XIV); and to

---

[4] The other Defendants named in Count I are:  NNH Reedy Creek; RN Reedy Creek; Mohammed Hemani; Nasiruddin Hemani; Ahmed and Shamida Lakhani; Altaf and Nasreen Hemani; Kevin Walsh; Cary Consulting Group, Inc., Mortgage Electronic Registration Systems, Inc.; Osceola County, Florida; Thomas M. Collins, individually; Thomas M. Collins d/b/a To The Rescue Contract Flooring, Inc.; Courtyards at Reedy Creek Condominium I Association, Inc.; and Unknown Parties Having or Claiming any Right, Title, or Interest in the Property.

[5] This count is brought against NNH Reedy Creek, Altaf Hemani, Mohammed Hemani, Nasiruddin Hemani, and Nasreen Hemani. (See Doc. 5 at 27).

recover from the borrowers on the 2008 promissory notes (Counts V, VII, IX, XI, XIII, and XIV).

Now before the Court are the motions for summary judgment filed by Frazee, the FDIC, and CRE/ADC. In its motion, Frazee seeks summary judgment on Counts I, II, III, and IX of the SAC. The FDIC seeks summary judgment in its favor on Counts IV through X of the SAC, and CRE/ADC seeks summary judgment on Counts I, IV, VI, VIII, X, XII, and XIV of the Counterclaim.

## II.    Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986)). "[A]t the summary judgment stage the judge's function is not himself

to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

## III. Discussion

In the three motions before the court, summary judgment is sought by one or more parties on seventeen of the twenty-five counts asserted in the SAC and Counterclaim combined. Of those seventeen, thirteen are either unchallenged or expressly conceded. The uncontested counts will be addressed first, followed by those as to which there is a dispute. Finally, I will comment on the eight counts not raised in any of the three motions.

### A. Unchallenged/Conceded Counts

#### 1. Counts II and III of the SAC

In Counts II and III of the SAC, Frazee brings claims of breach of contract (Count II) and quantum meruit (Count III) against RCH and Florida Builders, alleging that these Defendants failed to pay Frazee for the work done on the renovation project. RCH and Florida Builders have not responded to Frazee's summary judgment motion.

Frazee seeks the same amount of damages in each of these two counts— $2,874,257.34—which it explains is the cost of the work it performed ($9,403,914.51) less payments received ($6,529,657.17). Frazee also seeks title search charges ($585.00) and accrued interest as of December 1, 2013 ($808,696.10), for a total due as of December 1, 2013, of $3,683,538.44. Frazee has supported these amounts with affidavits and other evidence. (See, e.g., Pamela Taylor Aff., Doc. 156-8). Frazee asserts that it is entitled to recover that amount "either in law or equity." (Doc. 155 at 6).

As implicitly recognized by Frazee in its summary judgment motion, Counts II and III are alternative counts, and recovery may not be had on both. See Wynfield Inns v. Edward LeRoux Grp., Inc., 896 F.2d 483, 488 (11th Cir. 1990) ("Under Florida law,

recovery of damages under both a quantum meruit and a contract theory is inconsistent, such remedies being mutually exclusive and alternative measures of recovery."). Frazee will be given an opportunity to explain to the Court its position as to whether relief should be granted on Count II or Count III. The Court thus reserves ruling on Frazee's motion insofar as it pertains to these two counts.

2.    *Counts IV through VIII of the SAC*

In Counts IV through VIII of the SAC, Frazee brings five claims against Premier Bank—equitable lien before completion (Count IV); equitable estoppel (Count V); equitable lien after completion (Count VI); unjust enrichment (Count VII); and quantum meruit (Count VIII)—and these claims are now being defended by the FDIC. In its motion, the FDIC seeks summary judgment on these counts on the basis that they are barred under 12 U.S.C. §§ 1821(d)(9)(A) and 1823(e) and the D'Oench[6] doctrine, which provides that "a private party may not enforce against a federal deposit insurer any obligation not specifically memorialized in a written document such that the agency would be aware of the obligation when conducting an examination of the institution's records," Baumann v. Savers Fed. Sav. & Loan Ass'n, 934 F.2d 1506, 1515 (11th Cir. 1991).

In its memorandum in opposition to the FDIC's motion, Frazee "concedes that Counts IV through VIII are barred by the D'Oench doctrine and 12 U.S.C. §§ 1821(d) & 1823(e)." (Doc. 164 at 5). Frazee accordingly withdraws those claims. (See id.). In light of Frazee's concession, the FDIC's motion for summary judgment is granted as to Counts IV, V, VI, VII, and VIII of the SAC.

---

[6] D'Oench Duhme & Co. v. FDIC, 315 U.S. 447 (1942).

3.     *Counts IV, VI, VIII, X, XII, and XIV of the Counterclaim*

Counts IV, VI, VIII, X, XII, and XIV of Premier Bank's Counterclaim seek foreclosure of the six 2008 mortgages.[7]  CRE/ADC moves for summary judgment on these counts against all parties except Frazee.  None of the 2008 mortgagees has filed a response, and in June 2011 the mortgagees executed a Stipulation for Foreclosure (Doc. 148-23) and affidavits (Docs. 148-24 through 148-26) agreeing to the foreclosure of the 2008 mortgages.  In accordance with the Stipulation and the affidavits, CRE/ADC is entitled to summary judgment on Counts IV, VI, VIII, X, XII, and XIV of the Counterclaim as against all parties except Frazee.

**B.     Contested Counts**

1.     *Counts IX and X of the SAC*

In Count IX of the SAC, Frazee brings a claim against Premier Bank (now the FDIC) under section 713.3471, Florida Statutes, alleging that Premier Bank failed to provide proper and timely notice with regard to a construction loan as required by this statutory provision.  In Count X, Frazee brings a claim of breach of contract against Premier Bank, alleging that Premier Bank made and breached promises to Frazee to pay sums due for work on the renovation project.  Both Frazee and the FDIC have moved for summary

---

[7] Count IV seeks foreclosure of NNH Reedy Creek's mortgage, which covers units 101, 103, 105, 107, 109, 111, 201, 203, 205, and 207 in Building J; Count VI seeks foreclosure of RN Reedy Creek's mortgage, which covers units 102, 104, 106, 108, 110, 112, 202, 204, 206, and 208 in Building J; Count VIII seeks foreclosure of Mohammed and Lisa Hemani's mortgage, which covers units 101, 103, 105, 107, 109, 201, 203, 205, 207, and 209 in Building G; Count X seeks foreclosure of Nasiruddin and Rozina Hemani's mortgage, which units 102, 104, 106, 108, 110, 202, 204, 206, 208, and 210 in Building G; Count XII seeks foreclosure of the Lakhanis' mortgage, which covers units 101, 103, 105, 107, 109, 201, 203, 205, 207, and 209 in Building H; and Count XIV seeks foreclosure of Altaf and Nasreen Hemani's mortgage, which covers units 102, 104, 106, 108, 111, 202, 204, 206, 208, and 210 in Building H.

judgment in their favor on Count IX, and the FDIC, but not Frazee, has also moved with regard to Count X.

### a.    Count IX—§ 713.3471

Section 713.3471 is titled "Lender responsibilities with construction loans" and provides in part that "[w]ithin 5 business days after a lender makes a final determination, prior to the distribution of all funds available under a construction loan, that the lender will cease further advances pursuant to the loan, the lender shall serve written notice of that decision on the contractor," id. § 713.3471(2)(a).   Frazee contends that Premier Bank violated this and other portions of section 713.3471.[8]  The FDIC, however, maintains that this claim—like claims IV thorough VIII, which Frazee has conceded—is barred by the D'Oench doctrine and 12 U.S.C. §§ 1821 and 1823.  The FDIC also argues that there was no construction loan and that therefore Premier Bank was not subject to the requirements of section 713.3471, which pertain specifically to construction loans.   The FDIC's arguments have merit, and Count IX fails.

As noted earlier in connection with Counts IV through VIII of the SAC, the D'Oench doctrine provides that "a private party may not enforce against a federal deposit insurer any obligation not specifically memorialized in a written document such that the agency would be aware of the obligation when conducting an examination of the institution's records," Baumann, 934 F.2d at 1515.  The policy behind this doctrine has been described as follows:

> To carry out its duties, the FDIC must be able to rely on the bank's books and records as being accurate and reflecting the true state and condition of the insured bank's affairs.  When an insured bank enters into oral agreements which are not fully and accurately memorialized in the bank's records, the

---

[8] Frazee also alleges violations of subsections 713.3471(2)(b), (3)(a), and (3)(f). The discussion in the text disposes of all facets of Frazee's § 713.3471 claim.

true nature of the bank's rights and obligations might be obscured, and examiners can be misled, with the result that both depositors and the FDIC insurance fund are in jeopardy. In sum, the FDIC must be able to rely on the books and records of insured banks.

First State Bank of Wayne Cnty. v. City & Cnty. Bank of Knox Cnty., 872 F.2d 707, 715

(6th Cir. 1989).

"The D'Oench Doctrine is codified at 12 U.S.C. § 1823(e)." Lindley v. FDIC, 733

F.3d 1043, 1051 (11th Cir. 2013). Section 1823(e) provides in part:

> No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it . . . either as security for a loan or by purchase or as receiver for any insured depository institution[] shall be valid against the [FDIC] unless such agreement—
>
> (A) is in writing,
>
> (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
>
> (D) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e)(1). And, as provided in 12 U.S.C. § 1821(d)(9)(A), "any agreement

which does not meet the requirements set forth in section 1823(e) . . . shall not form the

basis of, or substantially comprise, a claim against the" FDIC.

Although Frazee has conceded that the D'Oench doctrine and §§ 1821(d)(9)(A) and

1823(e) bar its claims against Premier Bank in Counts IV through VIII of the SAC,[9] it

---

[9] Those claims were: Equitable Lien Before Completion (Count IV); Equitable Estoppel (Count V); Equitable Lien After Completion (Count VI); Unjust Enrichment (Count VII); and Quantum Meruit (Count VIII).

contends that Count IX is maintainable even in the face of these provisions, asserting that its claim that Premier Bank violated section 713.3471 is "not premised on an agreement"[10] but instead on a statute.  However, this claim does not survive D'Oench despite Frazee's attempt to recharacterize it.

Frazee argues that "no agreement forms the basis of Frazee's statutory claims" and that "there is no 'agreement' that Frazee seeks to enforce through its count IX." (Doc. 164 at 6).  This argument lacks logical and legal support.  Frazee contends that its claim is "premised on the fact that [Premier Bank], as a lender encumbering realty in the state of Florida, is subject to the laws of Florida, including a statutory liability (not contractual liability)" under section 713.3471.  (Id.).  However, the root of Frazee's claim is clearly a supposed agreement by Premier Bank to provide a construction loan.  Without such an agreement, there can be no obligation to provide construction funding and no attendant statutory obligations under section 713.3471.  Cf. Ne. Cmty. Dev. Grp. v. FDIC, 948 F. Supp. 1140, 1152-53 (D.N.H. 1995) (finding that claims under the New Hampshire Consumer Protection Act were barred by § 1823(e)(1) and the D'Oench doctrine where they "involved the alleged formation of an agreement between the plaintiffs and the Bank").[11]  Frazee's contention that its claim is not based on an agreement is not well-taken,

---

[10] (See Doc. 164 at 6).

[11] Frazee cites two cases for its position, but they are readily distinguishable.  In New Bank of New England v. Callahan, 798 F. Supp. 73, 77 (D.N.H. 1992), the court found that a claim against the FDIC for abuse of process did "not rely on 'agreements' within the meaning of D'Oench [and] section 1823(e)" because "[t]he obligation to refrain from abuse of process is one that arises from state law" and the claim was "based on the bank's legal obligations . . . rather than [on] purported agreements between the parties."  And, in Bascom Construction, Inc. v. FDIC, 777 F. Supp. 123,125-26 (D.N.H. 1991), the court held that a claim that the bank for which the FDIC had been substituted underbid property at a foreclosure sale was not barred by D'Oench because no "agreement" was implicated.  In

and Count IX is barred by the D'Oench doctrine and 12 U.S.C. §§ 1821 and 1823.

Even if Count IX were not barred by this doctrine and these statutory provisions—which inure to the benefit of the FDIC—Count IX would fail in any event due to Frazee's failure to establish the existence of a construction loan.   In other words, proof of a construction loan is essential to this claim even aside from the D'Oench issue, and Frazee has not presented evidence supporting a conclusion that there was a construction loan or any other agreement creating an obligation of Premier Bank to make payments to Frazee. This lack of evidence is discussed in more depth infra with regard to Count X, but it is an additional reason that the FDIC is entitled to summary judgment on Count IX.

### b.      Count X—Breach of Contract

Frazee's breach of contract claim in Count X of the SAC alleges that Premier Bank made "verbal and written promises to pay Frazee" and that "Premier Bank breached its promises and agreements with Frazee by failing to pay Frazee the entire sums due and owing." (SAC ¶¶ 114, 116).  The FDIC argues that Frazee's breach of contract claim in Count X of the SAC fails for the same reasons as does Count IX.  I agree.  Although Frazee maintains that "a valid and enforceable contract regarding providing financing for construction was entered into between Premier and Frazee, which Premier (now the FDIC) breached," (Doc. 164 at 8), Frazee has not presented evidence supporting the existence of such a contract, and certainly not evidence meeting the specific requirements of 12 U.S.C. § 1823(e).

---

the case at bar, on the other hand, Frazee's claim necessarily requires some agreement by Premier Bank to provide a construction loan; otherwise, the obligations of section 713.3471 are not triggered.

It is undisputed that in late 2007 and early 2008, discussions took place about ways to finance work on the renovation project, and some of the discussions pertained to the possibility of a construction loan.   However, the record evidence also indicates that ultimately, funding was provided not through a construction loan but through mortgages from Premier Bank to the Hemani brothers, proceeds of which were used in part to pay Frazee.  Although Frazee attempts to characterize the 2008 funding arrangement as a construction loan or some other enforceable agreement between it and Premier Bank, this effort fails.

The evidence cited by Frazee as support for the existence of a contract does not establish a contract, nor does it satisfy the requirements of § 1823(e).   Frazee relies primarily on a December 26, 2007 email, with an attached letter, from Regina Hirn at Premier Bank to Daniel Frazee.  (Doc. 164-2).  However, this letter does not constitute a construction loan agreement; Frazee itself describes it as "encompass[ing] Premier's expectation" of financing the project.  (Doc. 164 at 9).  In the letter, Premier Bank states that it "is prepared to provide construction financing for the above referenced project in the amount of $13,964,715.75 . . . subject, at a minimum, to the following" and then asks Frazee to provide several documents; the letter states that "[u]pon receipt and satisfactory review of the above, we will proceed to establish a construction line which will fund through a construction escrow with a title company acceptable to the bank."  (Doc. 164-2 at 2).  Frazee sent documents to Premier Bank in response to this letter, and Premier Bank acknowledged receiving documents.   While Frazee contends that Premier's confirmed receipt of the requested documents constituted execution of "a valid and written contract, containing all essential terms," (Doc. 164 at 10), the receipt of the documents did not have

this legal effect. As acknowledged by Frazee's witnesses, the December 26, 2007 letter was at most a conditional offer and Premier Bank did not in that letter obligate itself to a construction loan. (See Daniel Frazee Dep. at 154[12] (agreeing that if Premier Bank's review of the provided documents was not satisfactory, Premier Bank "had the option not to do a construction loan"); Chuck Frazee Dep. at 39-40[13] (agreeing that in the December 26, 2007 letter, Premier Bank reserved the right not to go forward with a construction loan)).

Other record evidence buttresses the conclusion that the December 2007 letter did not establish a construction loan and that one was never agreed upon. In a February 6, 2008 letter, Hirn informed Altaf Hemani, one of RCH's members, that Premier Bank was "willing to consider [his] request" for construction funding; that letter specifically stated: "THIS IS NOT AND SHALL NOT BE CONSTRUED BY ANYONE TO BE A COMMITMENT ON THE PART OF THE BANK TO PROVIDE THE FINANCING REQUESTED. The sole purpose of this letter is to express the Bank's interest while the loan proposal awaits final approval by the Bank's full Board of Directors." (Doc. 147-12) (emphases in original). Clearly, funding options were still being discussed at that point in time. And, in an email to Frazee's CFO that same day, Hirn noted that "[b]ecause of the overall resistance to a formal construction loan, most of the proceeds will be funded based on the closings of individual units." (Doc. 147-13). Frazee's witnesses acknowledged in their depositions that they knew of no written agreement illustrating the existence of a construction loan or any obligation by Premier Bank to provide additional funding. (Chuck Frazee Dep. at 40[14];

---

[12] (Doc. 147-11 at 2).

[13] (Doc. 147-14 at 2-3).

[14] (Doc. 147-14 at 3).

Daniel Frazee Dep. at 38, 173, 182, 286-87[15]).   They also testified that they knew that funding for the project was coming from closings on the sales of units to RCH members. (See Chuck Frazee Dep. at 50[16]).

Frazee also relies on the fact that a "Construction Escrow Account" was established to pay Frazee using the 2008 mortgage loan proceeds, but the existence of such an account does not establish a contract between Frazee and Premier Bank.   Frazee also cites minutes of a February 21, 2008 Premier Bank Board of Directors meeting that refer to approval of a $4 million construction loan.   (Doc. 164-5 at 5).   However, this single reference does not satisfy the four requirements of 12 U.S.C. § 1823(e) or establish an enforceable obligation of Premier Bank toward Frazee.   Additionally, Frazee cites the HUD statements from the closings of the sales of the finished units to the Hemani brothers, but those documents also fail to create a commitment by Premier Bank to Frazee.

In sum, Frazee has not presented evidence of a construction loan or any kind of enforceable agreement between Frazee and Premier Bank.   Frazee attempts to cobble together an enforceable obligation from various pieces of correspondence and other documentation, but even if Frazee had succeeded at establishing the existence of some type of an agreement—which it has not—the evidence does not meet the requirements of 12 U.S.C. § 1823.   Accordingly, the FDIC is entitled to summary judgment on Count X of the SAC.

---

[15] (Docs. 145-11 & 170-1).

[16] (Doc. 147-14 at 4).

2.  *Count I of the SAC and Count I of the Counterclaim*

In Count I of the SAC, Frazee seeks to foreclose its 2007 construction lien.  In Count I of the Counterclaim, Premier Bank (now CRE/ADC) seeks to foreclose its 2006 mortgage.[17]  Both sides attempt to upset the seemingly straightforward order of priority of the 2006, 2007, and 2008 liens at issue in this case.  As set forth below, some issues remain for further argument, but at this point neither side has persuaded the Court that there is a basis to alter the time priority of the liens.

As CRE/ADC notes in its summary judgment motion, the general rule governing lien priority in Florida is "'first in time is first in right.'"  Holly Lake Ass'n v. Fed. Nat'l Mortg. Ass'n, 660 So. 2d 266, 268 (Fla. 1995) (quoting Walter E. Heller & Co. Se., Inc. v. Williams, 450 So. 2d 521, 532 (Fla. 3d DCA 1984)).  It is undisputed that the 2006 mortgage was recorded prior to the recording or creation of any Frazee lien, and it is also undisputed that the Frazee lien was recorded before the 2008 mortgages were executed or recorded.  The 2006 RCH-Premier Bank purchase money mortgage in the amount of $5.625 million was recorded in September 2006; Frazee's Claim of Lien against the property in the amount of $5.7 million was recorded in December 2007 and "take[s] priority as of the time of recordation of the notice of commencement" in April 2007, § 713.07(2), Fla. Stat.; and the six 2008 mortgages were recorded from March to September 2008.

Frazee asserts that its lien is superior to the 2006 mortgage in whole or in part, and Premier Bank asserts that the 2008 mortgages are superior to Frazee's 2007 construction lien.  These contentions are addressed in turn.

---

[17] CRE/ADC acknowledges that the 2006 mortgage is no longer in effect with regard to two completed condominium units ("the Walsh/FBC units") as to which Premier Bank issued a Partial Satisfaction of Mortgage.  (See Doc. 148 at 6).  Those units were the subject of a prior motion by MERS/FBC Mortgage.  (See id.; see also Order, Doc. 80).

### a.    2006 Mortgage Versus 2007 Claim of Lien

In its response to CRE/ADC's summary judgment motion, Frazee asserts that its 2007 lien "is superior to all other liens for the entirety of the property . . . , including the 2006 mortgage."[18] (Doc. 165 at 2).  Frazee makes this argument despite acknowledging that no satisfactions of mortgage or lien releases were recorded and that the 2006 loan has not been paid in full.  (Id. at 3).  Frazee contends that its 2007 lien should be declared superior to the 2006 mortgage because Premier Bank "either intentionally or inadvertently failed to issue lien releases that were required by both law . . . and contract . . . and because of [Premier Bank's] failure to assert adequate control over its funds/funding."  (Id.).

Frazee divides its argument into two parts, corresponding to the unrenovated and renovated portions of the property.  First, Frazee contends that its 2007 lien has priority over the unfinished portion of the property because Premier controlled funds sufficient to pay off the 2006 mortgage or to pay Frazee, yet failed to do so.  Second, Frazee asserts in the alternative that it is "entitled at a minimum[] to a superior lien over the finished sixty units because the 2006 note and mortgage were partially satisfied, which Premier [Bank] was legally obligated to record."  (Id. at 7).

As to the unfinished portion of the property, Frazee bases its lien priority contention on principles of equity, asserting that Premier Bank should not benefit from its own "bad conduct."  (Id. at 3).  Frazee claims that some of the proceeds of the 2008 loans were put into reserve accounts instead of being used to pay Frazee.  In the alternative, Frazee argues that escrowed funds from the 2008 loans "could and should have been used" to

---

[18] In Count I of the SAC, Frazee did not allege that its 2007 lien was superior to the 2006 mortgage; it did not mention the 2006 mortgage at all in that count, though it did list the 2008 Premier Bank mortgages as inferior interests.  (See SAC at 6-11).

pay off the 2006 mortgage, "which would have resulted in Frazee having a superior lien position." (Id. at 4). Frazee contends that "sufficient funds existed as a result of the six 2008 loans to have either paid off the 2006 loan, or to have paid Frazee in full, in which case, it would not be a party to the instant lawsuit." (Id.). Frazee also takes issue with the HUD statements from the 2008 closings, asserting that more than $3.5 million in funds "could or should have been paid to Frazee." (Id. at 6).

Frazee's arguments for jumping the 2006 mortgage in priority as to the unfinished portion of the property are rejected. As aptly noted by CRE/ADC, Frazee's position is based on arguments as to what Frazee feels "could and should" have happened. (See Doc. 171 at 1). CRE/ADC also points out that "Frazee, as a non-party to any of the 2006 or 2008 Loan agreements[,] lacks any standing or authority to insist that the terms agreed to by the parties after negotiation in 2008 should somehow be judicially modified to be even more favorable to Frazee." (Id. at 5). Further, CRE/ADC notes that the funds provided under the 2008 mortgages reduced both the debt secured by the 2006 mortgage and the balance of Frazee's construction lien by several million dollars each—benefiting Frazee. (Id.). In sum, Frazee has not presented a basis for advancing its 2007 lien ahead of the 2006 mortgage as to the unfinished portion of the property.

With regard to the sixty finished units on the property, Frazee asserts that Premier Bank was obligated—but failed—to record a partial satisfaction of the 2006 mortgage and that for that reason Frazee's lien should obtain priority over the sixty finished units as to which the 2008 mortgage loans were made. Frazee bases Premier Bank's supposed obligation on both statute and contract, but neither is of assistance to Frazee.

Frazee cites section 701.04, Florida Statutes, for the proposition that "once the

indebtedness due on a note has been fully paid, the mortgagee shall execute in writing an instrument acknowledging satisfaction of the mortgage and have the instrument entered in the official records of the proper county" and that the mortgagee "must send the recorded satisfaction to the party who made the full payment within sixty . . . days." (Doc. 165 at 7) (emphasis removed).  Additionally, Frazee relies on a provision in the 2006 mortgage[19] titled "Full Performance" that required Premier Bank, upon payment of "all the indebtedness," to "execute and deliver to [RCH] a suitable satisfaction of this Mortgage." (Doc. 165-6 at 5).  Frazee also cites case law for the assertion that "[w]here a mortgage requires a mortgagee to issue a lien satisfaction . . . the 'mortgagor has [an] absolute right to release.'"  (Doc. 165 at 7 (citing Empress Homes, Inc. v. Levin, 201 So. 2d 475, 477 (Fla. 4th DCA 1976)).

Frazee's statutory and contractual arguments fail for several reasons.  First, Frazee lacks standing to assert that Premier Bank was obligated to record a lien satisfaction. Frazee is not the mortgagor under the 2006 mortgage and is not a party to the 2006 mortgage at all.  Additionally, even if Frazee had standing to assert entitlement to a release of lien, Frazee does not assert that the 2006 loan has been fully paid; indeed, it is undisputed that it has not been fully paid.  Thus, the statutory and mortgage provisions upon which Frazee relies do not apply to the circumstances here.  The statute does not require a release upon partial payment, and neither does the 2006 mortgage itself.[20]

---

[19] Frazee refers to the 2008 mortgages in the text of its argument on this point, but the cited record evidence is the 2006 RCH mortgage, which makes more sense in the context of this argument. (See Doc. 165 at 7 & n.22 (citing 2006 mortgage, Doc. 165-6, at 5)).

[20] Frazee's reliance on Premier Bank's release of lien as to two units that were sold to Kevin Walsh in 2007 is also misplaced.  CRE/ADC acknowledges that the 2006

Frazee's arguments as to a superior lien position over the 2006 mortgage as to the sixty finished units are without merit.

In sum, the Court finds that Premier Bank's 2006 mortgage lien is superior to Frazee's 2007 Claim of Lien.  CRE/ADC is entitled to summary judgment on Count I of the Counterclaim.[21]

### b.    2007 Claim of Lien Versus 2008 Mortgages

Frazee asserts that its 2007 Claim of Lien is superior to the 2008 mortgages, but the FDIC and CRE/ADC claim that there is a fact issue as to whether the 2008 mortgages "join in the seniority" of the 2006 mortgage lien.[22]  CRE/ADC argues that the 2008 mortgages should be subrogated to the lien priority of the 2006 mortgage to the extent that the 2008 loan proceeds were used to pay down the 2006 mortgage.

Although I am not convinced at this point that there are "fact issues" remaining as asserted by CRE/ADC or that subrogation is appropriate on the facts of this case, I will

---

mortgage does not remain in effect for those two units.  (Doc. 148 at 6).  However, the fact that Premier Bank released its lien as to those units did not obligate Premier Bank to do so as to others.

[21] No other party has challenged the priority of the 2006 mortgage.  Moreover, in the June 2011 Stipulation for Foreclosure and affidavits mentioned in the discussion of Counts IV, VI, VIII, X, XII, and XIV of the Counterclaim, RCH and the 2008 mortgagees stipulated to foreclosure of the 2006 mortgage as well.  (Docs. 148-23 & 148-24 through 148-26).

[22] Because CRE/ADC's position is that there is a fact issue as to whether the 2008 mortgages share the priority position of the 2006 mortgage, CRE/ADC did not seek summary judgment as against Frazee with respect to the foreclosure of the 2008 mortgages.  (See Doc. 148 at 3, 12).  Frazee contends that CRE/ADC has "admitted" that Frazee's 2007 lien is superior to the 2008 mortgages.  (See Doc. 176 at 6 ("The [CRE/ADC] motion was crystal clear that Frazee has a superior lien position to the 2008 loans and [CRE/ADC] cannot wiggle out of a previous admission by asking this court to disregard the earlier admission.")).  However, CRE/ADC has not admitted or conceded this point.  CRE/ADC did not seek summary judgment in its favor on the issue of priority between the 2007 lien and the 2008 mortgages, but that was not a concession that the 2007 lien is superior.

hear argument of counsel regarding the issues of legal and equitable subrogation raised by CRE/ADC in the Response in Opposition (Doc. 172) to Frazee's summary judgment motion. Additionally, I will hear argument regarding the effect of the "Waiver and Release of Lien" documents executed by Frazee with regard to the completed units that are secured by the 2008 mortgages. (See, e.g., Doc. 160-2 at 15). Thus, ruling is reserved on the issue of priority between Frazee's 2007 lien and the 2008 mortgages.

### C.    Counts Not Raised in Any of the Summary Judgment Motions

While all counts of the SAC are addressed in one or more of the motions now before the Court, summary judgment has not been sought by any party on Counts II, III, V, VII, IX, XI, XIII, or XV of the Counterclaim. Count II is a claim on the 2006 RCH promissory note, and Count III is a claim on the guaranties of that note. Counts V, VII, IX, XI, XIII, and XV are claims on the promissory notes for each of the six 2008 loans.

When CRE/ADC was substituted in the place of the FDIC, it was substituted only as to Counts I, IV, VI, VIII, X, XII, and XIV of the Counterclaim. (See Mot., Doc. 134; Order, Doc. 146). Moreover, although not noted in any of the summary judgment motions, in the Stipulation for Foreclosure signed by the mortgagees, Premier Bank agreed to release the mortgagees from repayment of the loans as described in these counts and also agreed that once Premier Bank obtained foreclosure of the mortgages, it would promptly file for dismissal of these counts.[23] (Doc. 148-23 at 5 & 6). The Court presumes that this provision of the Stipulation for Foreclosure is the reason that no motion has yet been filed with regard

---

[23] The Court notes that there appears to be a clerical error in the Stipulation of Foreclosure with regard to Counts XIII and XV. Count XIII is listed twice, but Count XV is not mentioned at all. (See Doc. 148-23 at 5).

to these counts of the Counterclaim.  In any event, and whatever the reason, these counts remain pending in this case at this time.

## IV.    Conclusion

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. The FDIC's Motion for Final Summary Judgment on Counts IV-X of Frazee's Second Amended Complaint (Doc. 147) is **GRANTED**.  The FDIC prevails on each of these counts.

2. CRE/ADC's Motion for Partial Final Summary Judgment on Counts I, IV, VI, VIII, X, XII, and XIV of FDIC's Counterclaim and Cross-Claims and Count I of Frazee's Second Amended Complaint (Doc. 148) is **GRANTED**. CRE/ADC prevails on Count I.  The Court finds that the 2006 mortgage is superior to all other asserted liens with respect to the property except for the two units that were the subject of the Partial Satisfaction of Mortgage to Kevin Walsh.  CRE/ADC also prevails on Counts IV, VI, VIII, X, XII, XIV as to all parties except Frazee.

3. Frazee's Motion for Final Summary Judgment (Doc. 155), which pertains to Counts I, II, III, and IX of the Second Amended Complaint, is **DENIED in part,** and ruling thereon is **RESERVED in part.**  The motion is **denied** as to Count IX.  Ruling is **reserved** as to Counts I, II, and III.

4. Frazee's Request for Oral Argument (Doc. 163) is **GRANTED in part** and **DENIED in part**.  The request is **denied** insofar as it pertains to matters already ruled upon in this Order.  The request is **granted** insofar as the Court will hear argument on the issues identified in this Order.

5. A final pretrial conference has already been scheduled for **Thursday, May 8, 2014, at 9:30 a.m.** At that time, counsel shall be prepared to argue the issues of subrogation and the legal effect of the "Waiver and Release of Lien" documents executed by Frazee noted earlier in this Order.  Counsel shall also be prepared to address whether the estates of the two deceased parties—Mohammed and Nasiruddin Hemani—have been made, or need to be made, parties to this case.  Additionally, counsel for Frazee shall be prepared to address whether relief should be granted to Frazee on Count II or Count III of the SAC, as Frazee cannot prevail on both of these counts.

**DONE** and **ORDERED** in Orlando, Florida, on April 30 , 2014.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Parties